STATE OF TEXAS et al. v. UNITED
STATES et al. *

No. 2424.

District Court, W. D. Missouri, W. D.
Feb. 6, 1934.

James V. Allred, Atty. Gen., for the State of Texas.

Elmer L. Lincoln, of Texarkana, Tex., for City of Texarkana, Tex.

J. A. R. Moseley, Jr., of Texarkana, Tex., for Bowie County, Tex.

E. M. Reidy, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., Elmer B. Collins, Sp. Asst. to Atty. Gen., Harold M. Stephens, Asst. Atty. Gen., and William L. Vandeventer, U. S. Atty., of Kansas City, Mo., for the United States.

Samuel W. Moore, of New York City, and Frank H. Moore, and Cyrus Crane (of Lathrop, Crane, Reynolds, Sawyer & Mersereau), both of Kansas City, Mo., for defendant railway companies.

Before VAN VALKENBURGH, Circuit Judge, and REEVES and OTIS, District Judges.

PER CURIAM.

The Texarkana & Fort Smith Railway Company is a Texas corporation owning in two segments approximately eighty-one miles of railway in that state and having its general offices and principal place of business at Texarkana. On February 13, 1932, the Kansas City Southern Railway Company, a Missouri corporation, applied to the Interstate Commerce Commission for an order authorizing the acquisition by it of control under lease of the properties of the Texarkana & Fort Smith Railway Company. Subsequently, on August 8, 1933, on account of an amendment of the Interstate Commerce Act effective June 16, 1933 (the Emergency Railroad Transportation Act [48 Stat. 211]), a supplemental application was made for a similar order. The application was granted by the Commission and its order made October 4, 1933.

The lease which had been entered into between the two railway companies included, in the second paragraph of Section 5 thereof, the following provision: "The Southern Company does not assume any obligation to maintain, during the term of this lease, any

*Decree affirmed 54 S. Ct. 643, 78 L. Ed. ——.

general offices, machine shops, or roundhouses for or belonging to the Texarkana Company at any particular place or places, regardless of present or previous locations thereof; but shall have the right to change any existing location of general offices, machine shops, roundhouses and terminal facilities, belonging to the Texarkana Company, and to relocate the same, and, from time to time, to change the same, during the full term of this lease, and shall have the right to make all such locations, changes, and alterations as in the judgment of the Southern Company will enable it to .operate the demised premises in the public interest and with the greatest economy and efficiency; and the Southern Company shall not be obligated or bound to perform any contractual, statutory or other obligations with reference to such matters which may now or hereafter rest upon the Texarkana Company; and any and all such changes may be made, from time to time, by the Southern Company as may be approved by the judgment of its officers or Board of Directors."

By its order the Commission authorized the acquisition by the Missouri corporation of the properties of the Texas corporation under the lease entered into between them, and so approved the lease, including the provision of the lease hereinbefore set out. The Kansas City Southern now proposes, as permitted by the ·lease between it and the Texas corporation, to remove from Texarkana, Tex., where they are now located, and to relocate outside of Texas, the general offices, machine shops, roundhouses, and terminal facilities of the leased railroad. The state of Texas, the railroad commission of that state, Boyd county, Tex., and the city of Texarkana, the complainants in this proceeding, being interested in retaining at Texarkana the general offices, machine shops, roundhouses, and terminal facilities of the Texarkana and Fort Smith, have brought this proceeding in equity to restrain the relocation proposed and the execution of the lease in so far as the second paragraph of section 5 thereof is concerned. The two railroad companies, the Interstate Commerce Commission, and the United States are made defendants and have filed answers to complainants' bill.

The case is here on final hearing. No question of fact is in dispute. It is admitted by complainants that the application for approval of the acquisition by the Missouri company of the properties of the Texas company by lease and for approval of the lease was duly presented to the Commission and so heard by that Commission as to comply with all requirements of the applicable statute and due process; that the Commission made a finding, fully supported by the evidence, to the effect that the continued maintenance at Texarkana of the facilities and agencies here involved would impose an annual and unnecessary burden on interstate commerce in the amount of $81,000. But it is insisted that the provision in the lease permitting the proposed relocation and the authorization of that provision by the Commission are invalid as violating article 6278, tit. 112, of the Revised Civil Statutes of Texas for 1925.

Article 6278 must be read in connection with article 6260. In substance they require every corporation owning or operating a railway in Texas to incorporate in that state and to maintain its general offices in that state. The text of articles 6260 and 6278, so far as necessary, is set out in the margin.[1]

The complainants disavow any contention that Congress could not under the commerce clause vest the Interstate Commerce Commission with jurisdiction to approve the acquisition by lease by one railroad company of the properties of another and to approve a provision in such a lease of the character of that in question here notwithstanding such a statute as article 6278. The very limited contention of the complainants is that Congress has not conferred such authority on the Commission. Whether it has done so is the narrow and the only question the case presents. The question seems to us scarcely debatable.

■ 1. When the supplemental application was presented to the Commission and its order made, the Emergency Railroad Transportation Act of 1933 had been approved and was the law. In title 2 of that act, among other

---

[1] "Art. 6260. No corporation, except one chartered under the laws of Texas. shall be authorized or permitted to construct, build, operate, acquire, own or maintain any railways within State.

"Art. 6278. Railroad companies shall keep and maintain at the place within this State where its general offices are located the office of its president, or vice-president, secretary, treasurer, local treasurer, auditor, general freight agent, traffic manager, general manager, general superintendent, general passenger and ticket agent, chief engineer, superintendent of motive power and machinery, master mechanic, master of transportation, fuel agent, general claim agent; and each one of its general offices shall be so kept and maintained by whatever name it is known, and the persons who perform the duties of said general offices, by whatever name known, shall keep and maintain their offices at the place where said general offices are required to be located and maintained; and the persons holding said general offices shall reside at the place and keep and maintain their offices at the place where said general offices are required by law to be kept and maintained."

things, it is provided (section 202(4) (a, b), (15), 49 USCA § 5(4) (a, b), (15) that:

"(4)(a) It shall be lawful, with the approval and authorization of the Commission * * * for any carrier * * * to * * * lease * * * the properties * * * of another. * * *

"(b) Whenever a * * * lease * * * is proposed * * * the carrier * * * seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties * * * involved in the proposed transaction is situated, and also such carriers and the applicant or applicants, of the time and place for a public hearing. If after such hearing the Commission finds that * * * the proposed * * * lease * * * will be in harmony with and in furtherance of the plan for the consolidation of railway properties * * * and will promote the public interest, it may enter an order approving and authorizing such * * * lease * * * upon the terms and conditions and with the modifications * * * found to be just and reasonable. * * *

"(15) The carriers and any corporation affected by any order made under the foregoing provisions of this section shall be, and they are hereby, relieved from the operation of the antitrust laws as designated in section 1 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914, and of all other restraints or prohibitions by or imposed under authority of law, State or Federal, insofar as may be necessary to enable them to do anything authorized or required by such order."

Since no question is made of the power of Congress to enact this statute, only its interpretation is now required. The language is plain and unambiguous. Unequivocally it empowers the Commission to approve the acquisition of properties of one railroad by another through a lease of those properties and to pass upon and, therefore, to approve or reject, the terms and conditions of the lease. When in a given instance the Commission has made an order approving acquisition by a lease and approving the lease, the carriers affected are, by the very words of the statute, relieved from the operation of any state law to the restraint or prohibition of which otherwise they would be subjected, if such relief be necessary to the doing of anything which the order authorizes.

The order of the Commission here approved and authorized a lease under which the lessee was authorized to remove the general offices of the lessor from the state of Texas. A Texas statute restrained and prohibited the very thing thus authorized. Here then is just such a restraint and prohibition, imposed by authority of state law, as is expressly eliminated by the very words and plain meaning of the act of Congress.

But it is contended by counsel for complainants that the language of paragraph (15) set out above is not to be construed to refer to *all* restraints and prohibitions imposed under authority of law, state or federal, as a literal reading of the section would require, but to include only restraints and prohibitions of an anti-trust character. The rule of ejusdem generis is relied on. The same contention was made in the case of New York Central Securities Co. v. United States, 287 U. S. 12, 26, 53 S. Ct. 45, 77 L. Ed. 138. The Supreme Court did not find it necessary in that case to pass on the validity of the contention, and it does not appear ever to have been passed on by any court. The contention seems to us untenable.

There are several sufficient grounds for this conclusion. First of all, the rule ejusdem generis is a rule of construction only "to be used as an aid in the ascertainment of the intention of the lawmakers, and not for the purpose of subverting such intention when ascertained." Mid-Northern Oil Co. v. Walker, 268 U. S. 45, 49, 45 S. Ct. 440, 441, 69 L. Ed. 841. And it is quite apparent, from a consideration of the whole act of which paragraph (15) is a part, that the intention of Congress was to make possible the consolidation of railroad properties for the primary purpose of reducing the costs of railroad operation by removing wastes from which in turn the public would profit through rate reductions and more efficient service thereby made possible. New York Central Securities Co. v. U. S., supra, loc. cit. 25, 26 of 287 U. S., 53 S. Ct. 45, 77 L. Ed. 138. Greater economy in railroad operation through consolidation and not consolidation on its own account is the end sought. To say that Congress intended to strike down only those 'federal and state restraints and prohibitions which would prevent consolidations, but did not intend to strike down such restraints and prohibitions as would prevent the accomplishment of the primary purpose of permitting consolidations, is to assume that Congress intended only a half finished piece of work. No such assumption is justified. The intent

of Congress in the act was to remove all obstacles to the accomplishment of the purpose for which the act was passed.

The rule ejusdem generis, moreover, does not apply here for another reason. The rule is that where in a statute general words follow the enumeration of particular classes, the general words will be construed as applicable only to things of the same general nature as those enumerated. The particular words of paragraph (15) are—"the antitrust laws as designated in section 1 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914." But those are all of the antitrust laws of the United States. The particular words, therefore, embrace all objects of their class. Application of the rule then would make meaningless the general language following the specific words—"all other restraints or prohibitions by or imposed under authority of (federal) law." Where such a result would follow the rule does not apply. Mason v. United States, 260 U. S. 545, 553, 43 S. Ct. 200, 67 L. Ed. 396.

Again the so-called general words of the paragraph, "all other restraints or prohibitions," in effect are interpreted by the very context in which they appear. The carriers are to be relieved of the operation of such restraints and prohibitions "insofar as may be necessary to enable them to do anything authorized or required by such order" (i. e. order of the Commission). This is a description of the restraints and prohibitions aimed at. They are any such as would interfere with the doing of things authorized or required. The description negatives the contention that something less was intended than the description would include.

Finally, if there were any doubt as to the conclusion that the "restraints and prohibitions" referred to in paragraph (15) include all restraints and prohibitions, that doubt is altogether removed by a consideration of the identical language used in title 1 of the same act. "Where the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout." 59 C. J. 1003; Pampanga Sugar Mills v. Trinidad, 279 U. S. 211, 218, 49 S. Ct. 308, 73 L. Ed. 665. As used in title 1, the meaning of the same language repeated in title 2 is fully explained by the context and that explanation is altogether inconsistent with the contention now made for a limited meaning of the words "restraints or prohibitions imposed by law, state or federal."

In title 1, §§ 10, 11 of the act (49 USCA §§ 260, 261), the language used is as follows:

"The carriers or subsidiaries subject to the Interstate Commerce Act, as amended, affected by any order of the Coordinator or Commission made pursuant to this title shall, so long as such order is in effect, be, and they are hereby, *relieved from the operation of the antitrust laws, as designated in section 1 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914, and of all other restraints or prohibitions by law, State or Federal,* other than such as are for the protection of the public health or safety, *in so far as may be necessary to enable them to do anything authorized or required by such order made pursuant to this title:* Provided, however, That nothing herein shall be construed to repeal, amend, suspend, or modify any of the requirements of the Railway Labor Act or the duties and obligations imposed thereunder or through contracts entered into in accordance with the provisions of said Act.
» * *

"Nothing in this title shall be construed to relieve any carrier from any contractual obligation which it may have assumed, prior to the enactment of this Act, with regard to the location or maintenance of offices, shops, or roundhouses at any point."

Obviously if the language here used were for construction it could not be contended that the words "restraints or prohibitions by law, State or Federal," included only antitrust restraints and prohibitions. If that had been the intended meaning, then there was no necessity for the express exclusion of such restraints and prohibitions as are for the protection of the public health and safety. What is still more significant, it was thought necessary to expressly limit the phrase "restraints or prohibitions by law, State or Federal," so as not to include restraints arising from contractual obligations with regard to *the location or maintenance of offices, shops, or roundhouses at any point.* If the phrase is not in title 1 limited to anti-trust laws, it cannot be so limited when repeated in title 2.

■ 2. What we have said disposes of this case. We add, however, that in our view the power of the Commission to authorize the lease provision complained of, although made clear by paragraph (15), does not depend on that paragraph but would exist without it. The Commission is given the power to authorize the leasing by one railroad company

of the properties of another and to determine the conditions and terms of the lease. The act of Congress so empowering the Commission ex proprio vigore nullified state laws conflicting with the exercise of the power given. When Congress legislated, as by this act inter alia it did, that where possible railroad systems should be unified so that where before there were two or more connecting systems thereafter there should be one only and that one system regulated by the national government, that system no longer is subject to any state regulation involving the imposition of a burden on interstate commerce unless it be merely the incidental result of a proper exercise of the police powers of the state. After such legislation, pre-existing state laws imposing burdens on and therefore regulating the unified system cease to be effective and similarly newly enacted state laws of a like character ab initio have no validity. These are well-established principles. They are applicable to the facts of this case.

Here is a railway system interstate in character and used for the transportation of freight and passengers in commerce among the states. It was conceded at the argument that in reality it has been for years a single system, its northern terminal at Kansas City, extending thence to the Gulf of Mexico. The railway properties involved are in several states. Texas is one of these. Two segments of the main line of this system are in Texas. Together they are eighty-one miles in length. Because of Texas law a separate Texas corporation owns and operates the segments in Texas. The simple question is: "When the system has been unified as the result of an act of Congress and the common management of the whole system has been authorized to discontinue unnecessary duplication of activities, may the state of Texas still require it to maintain general offices in Texas at a cost of $81,000 per year? If Texas can require every railroad company operating within its boundaries to incorporate in Texas and to maintain general offices and yards in Texas, the other states which this system traverses may do likewise. Missouri and Arkansas and Oklahoma and Louisiana may compel it to incorporate in and to maintain general offices and yards in their respective states. A more intolerable burden on commerce among the states scarcely can be imagined.

Counsel for defendants will prepare and submit for approval and entry a decree dismissing complainants' bill.